COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                SUPERIOR COURT DEPARTMENT
                                             TRIAL COURT DIVISION
                                             CIVIL ACTION NO.

SANDY HARRIS, JR.,

      Plaintiff,

v.

NATIONAL GRID USA SERVICE COMPANY, INC.

      Defendant

**Complaint and Jury Demand**

RECEIVED
7/1/2022   HG

## PARTIES

1. The Plaintiff, Sandy Harris, Jr. ("Mr. Harris" or "the Plaintiff"), is an individual now residing in San Diego, California.

2. The Defendant, National Grid USA Service Company, Inc., ("National Grid" or "the Defendant") is a domestic corporation whose principal place of business is 40 Sylvan Street Waltham, MA.

## STATEMENT OF FACTS

3. Mr. Harris is an African-American male.

4. National Grid is an electrical and gas utility and Mr. Harris' former employer.

5. In November 2017, National Grid began employing Harris as a Change Management Analyst.

6. Throughout Harris' tenure, he was a technologist whose primary responsibility was training others in new software systems that National Grid was adopting.

7. Harris would train various managers and staff on new software prior to its deployment, assist them with the software's "go-live" and provide follow-up support after the go-live date.

8. Harris' territory consisted of Massachusetts, Rhode Island and New York and he often traveled for work.

9. The company paid for Harris' travel expenses.

10. Harris originally reported to Melanie Smith, Director of Change Management.

11. However, in about January 2019, there was a reorg and Jesse Harvey came in and shared the Director Change Management role with Melanie Smith.

12. Harvey hired a new manager Trina Dombrowski.

13. As Harris was to learn, Dombrowski and Harvey were friends and had gone to the same high school.

14. Harris now reported to Dombrowski, rather than to the Director-level position held by Harvey and Smith.

15. In or about November of 2019, Harris traveled to St. Lucia for his sister's wedding.

16. The day of his Mr. Harris' return from St. Lucia, while he was still on vacation, he reached out to some colleagues to stay on top of the workstream.

17. Harris then was accused by Dombrowski, in an aggressive and hostile tone, of not being at work. Harris replied that he had the day off; that even though he was back in the States it was the last day of his vacation and he was merely trying to get a head start and stay on top of the workstream. He told Dombrowski that her tone made him uncomfortable. Nevertheless, Dombrowski never apologized.

18. Harris encountered the same hostility from Dombrowski in connection with his expenses. For instance, Dombrowski accused Harris of submitting receipts for two different dinners on the same night. Harris asked to see the receipts and showed her that the receipts were in fact for two different nights.

19. Dombrowski then accused Harris of renting a rental car while on a personal vacation. However, Harris was able to show that the rental car was returned before Harris went away on vacation.

20. Dombrowski pulled Harris into a room with Harvey on the phone to accuse Harris of improperly booking a hotel room in Times Square. Harris said Dombrowski's tone was upsetting and that it felt she were accusing him of fraud. Harris explained that he booked the hotel through the booking portal National Grid uses for hotel bookings, that the hotel was on the list of approved hotels, that it was within a 25-mile radius of where he was working and that he needed the hotel because he prefers to avoid night driving with his vision. Harris was told that, regardless of whether the booking of the hotel conformed to company policy it might look bad to ratepayers.

21. The issues raised by Dombrowski were then addressed in a meeting with Harris and Dombrowski physically present and Judy Dunn from Human Resources on WebEx. Harris was again criticized for the Times Square hotel and attacked over receipts which had faded with age and were illegible. Harris was told that he would personally need to call around and reconstruct the expenses and was given a deadline for doing so.

22. Within a week of this meeting, there was another meeting, this time with Harris, Harvey, Judy Dunn and Vice President Reihaneh Irani-Famili. Once again Harvey repeated the

contentions about the rental car, hotel and receipts. Harris questioned why the issues were continually being brought up when he had debunked the allegations. Judy Dunn advised Harris that he would have to pay for any undocumented expenses or expenses outside of company policy. VP Irani-Famili noted that Harris had never had any other criticisms before the expense issues and suggested 1:1 meetings between her and Harris.

23. Within a week of the first meeting with Dunn, Harris called around, gathered all the receipts he was able to collect by the deadline and submitted them to the expense department, Dombrowski and Harvey.

24. On Monday, March 9, when National Grid was observing International Women's Day, Harris had a 1:1 meeting with VP Irani-Famili. During the meeting, Harris, referencing the date, stated how important he believes it is that corporations correct gender imbalances in upper management positions. He also expressed how happy he is that his niece will have so many women role models in the business world.

25. VP Irani-Famili replied by alluding to the fact that, by virtue of her gender, she understands how challenging the workplace can be, "Because of….." and lifted her hand, rubbing the back of it, a remark and gesture that acknowledged challenges Harris faces in the workplace because of his skin color.

26. Indeed, Harris position was perhaps more isolating than VP Irani-Famili's. Harris was the only black person on his team of fifteen people. In the entire program of 250-300 people that Harris was part of, he was, to the best of his knowledge, one of three black people, the other two being Haitian-American and Nigerian-American.

27. VP Irani-Famili concluded the meeting by giving Harris a hug and telling him that he has a bright future at National Grid.

4

28. A couple weeks after, Harris had a second 1:1 meeting with VP Irani-Famili. The tone of this meeting was very different. VP Irani-Famili advised Harris that, if he wanted to progress within the company, he should stay in his lane. VP Irani-Famili indicated that it might take several years for him to be able to advance to Dombrowski's level, a longer timeline than had previously been suggested to Harris for advancement. VP Irani-Famili counseled Harris to ingratiate himself with Dombrowski and Harvey by acknowledging some sort of error in his actions.

29. Given the geographic expanse that Harris covered, he would often provide remote training and support via web chat, even prior to the outbreak of COVID-19.

30. In March 2020, when COVID-19 erupted in the northeastern United States, Mr. Harris was on Long Island, conducting an in-person training, when someone on-site developed flu-like symptoms and Mr. Harris and others were told they needed to quarantine.

31. Mr. Harris began working fully remotely at this point.

32. In July, Mr. Harris took a two-week vacation to visit his family in Ohio.

33. Mr. Harris' parents are elderly and vulnerable to COVID.

34. Mr. Harris himself has often suffered bronchial infections and is vulnerable to COVID.

35. While working remotely, Mr. Harris received notifications say that National Grid employees could work remotely out-of-state to assist family and for other reasons.

36. Based on Harris' understanding of National Grid's policies, he believed he was permitted to work out-of-state.

37. Harris informed Dombroski of his desire to work out-of-state.

38. Dombroski emailed Harris, asking him to conduct in-person trainings in Rhode Island.

39. Harris expressed unease with doing in-person training and highlighted that he would need to quarantine upon his return.

40. As Mr. Harris and Dombroski also knew, very few people would actually show up for any in-person training, as in-person attendance for the trainees was discretionary and almost all of the management and staff Harris was training were working remotely.

41. Dombroski insisted that Harris return for in-person meetings from July 28th through July 30th.

42. In response, Mr. Harris contacted Employee Services.

43. Mr. Harris emailed Dombroski a recap of his conversation with Employee Services, including the fact that he was told that he would need to quarantine for 14 days upon his return and that, "[A]s an office employee, I am not required to be on-site at National Grid facilities due to COVID-19 concerns."

44. Thereafter, Harris received an email from Human Resources' Judy Dunn, stating, in part, that, "The essential functions of your position within the Transformation Office required you to provide on-site services within our three-state geographic territory, NY, MA and RI," and that Harris was "violat[ing] the terms and conditions" of his employment "by not timely returning to the service territory to perform the work you were hired to do." Dunn warned Harris that failure to return to on-site work would be "deemed a resignation effective July 30, 2020." The email also offered nine weeks' severance if Harris voluntarily separated from the company.

45. Harris responded to Dunn's email within an hour, stating that, if he was not approved to work out-of-state, "I will drive to MA immediately."

46. Harris also indicated in the email that he had "pre-existing conditions that I believe puts me at a higher risk for COVID," and that was seeking a "reasonable accommodation" to work from home due to COVID.

47. Dunn responded by email later that evening, repeating that Harris was not allowed to work out-of-state, as on-site work was an "essential function" of his job. She also instructed: "Please [be] advised that you are required to return immediately to MA and contact the Company's Health and Wellbeing Department Theresa Overdyke to comply with the quarantine procedures. Your failure to timely comply will be deemed job abandonment."

48. On August 4, 2020, Dunn emailed Harris the nine-week severance offer and Harris replied, "as someone with preexisting conditions, I am requesting to take advantage of the company guideline" which permitted US-based workers to work remotely out-of-state if they meet certain criteria.

49. Dunn replied that Harris' request to work out-of-state was denied and stated, "The expectation is that you are in Massachusetts, to be on-site as needed, per your job and storm duty requirements."

50. Harris replied that same day, pointing out that Dunn's email, "does not address the need for a reasonable accommodation due to COVID-19 and my pre existing conditions. Please advise."

51. Dunn then responded, "Medical has no record of you having requested accommodations for a preexisting condition. You would need to contact our Health Department and provide them with the appropriate information and doctors."

52. On August 6, 2020 Harris apprised Dunn of his communications with the Health Department and asked if he were eligible for FMLA leave.

53. On August 7, 2020, Dunn directed Harris to National Grid's FMLA resources page.

54. On August 11, 2020 Harris followed up with Dunn to keep her informed of the fact that he had submitted a doctor's note to Sarah Lavalle of Employee Services.

55. On August 12, 2020, Lavalle sent Harris a letter, at Judy Dunn's behest, seeking additional documentation regarding Harris' request for accommodation and medical condition and instructing him to submit FMLA documentation to Sedgwick.

56. Also on August 12, 2020, Harris sent an email to Judy Dunn stating, "It is my understanding that my doctor faxed a note indicating that I am vulnerable to COVID as well, and recommends accommodations be made for me to work remotely. I've asked for assistance with this many times and also with applying for FMLA leave due to COVID. I am not abandoning my job. It is my sincere desire to continue to work for National Grid despite threats to my employment."

57. One week later, on August 19, 2020, Harris received a letter stating that he had been terminated effective August 19, 2020.

## JURISDICTION

58. On or about February 18, 2021 the Plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD").

59. The Plaintiff filed a request for leave to file this matter in Superior Court. The

8

MCAD then acted on this request by issuing to the Plaintiff a Dismissal and Notification of Rights letter.

60. All of the conditions precedent to the institution of this action have been fulfilled.

## STATEMENT OF CLAIMS

### COUNT I
### DISABILITY DISCRIMINATION (G.L. C. 151B)

61. The Plaintiff hereby restates and incorporates each of the preceding paragraphs of this Complaint as if fully stated herein.

62. Mr. Harris was a qualified handicapped person capable of performing the essential functions of the job with a reasonable accommodation.

63. Mr. Harris was not granted reasonable accommodation.

64. Defendant did not engage in an interactive process with Mr. Harris to determine the feasibility of a reasonable accommodation.

65. As a result of Defendant's actions, Mr. Harris has suffered injury.

### COUNT II
### RACE DISCRIMINATION (G.L. C. 151B)

66. The Plaintiff hereby restates and incorporates each of the preceding paragraphs of this Complaint as if fully stated herein.

67. At all times relevant hereto, the Defendant was an employer under Chapter 151B

68. As described herein, Plaintiff was discriminated against on the basis of his race.

69. Defendant acted with evil motive or reckless indifference to Plaintiff's rights.

70. As a result of Defendant's conduct, Plaintiff suffered injury.

9

## COUNT III
### Retaliation (G.L. c. 151B)

71. The Plaintiff hereby restates and reincorporates each of the preceding paragraphs of this Complaint as if fully stated herein.

72. The actions of the Defendant as set forth above constitute unlawful retaliation in violation of G.L. c. 151B §4(4) in that the Defendant took adverse employment action against Plaintiff because he engaged in activities protected under G.L. c. 151B.

73. As a result of Defendant's actions, Plaintiff has suffered substantial emotional and economic harm, including loss of wages, damage to reputation and future earning capacity.

## COUNT IV
### Retaliation in Violation of the Family and Medical Leave Act (29 U.S.C. §2615)

74. The Plaintiff hereby restates and incorporates each of the preceding paragraphs of this Complaint as if fully stated herein.

75. Plaintiff availed himself of his right under the FMLA to take leave time.

76. As a result of Plaintiff's availing himself of his rights under the FMLA, he suffered an adverse employment action, namely his termination.

77. Plaintiff's availing himself of his rights under the FMLA was the cause of his termination.

## COUNT V
### Interference with Protected Rights Under the Family and Medical Leave Act (29 U.S.C. §2615(a)(1))

78. The Plaintiff hereby restates and incorporates each of the preceding paragraphs of this Complaint as if fully set forth herein.

79. Plaintiff was eligible for time off under the Family and Medical Leave Act ("FMLA").

80. Defendant interfered with Plaintiff's rights under the Family and Medical Leave Act.

81. As a result of Defendant's actions, Harris has suffered injury.

## PRAYERS FOR RELIEF

WHEREFORE, the Plaintiff, Sandy Harris, Jr., hereby requests that this Honorable Court grant the following relief:

A. Assume jurisdiction of this case;

B. Enter judgment for him against the Defendant as to each count;

C. Compensate him for the economic losses he incurred as a result of the Defendant's conduct and the conduct of Defendant's agents;

D. Award him liquidated damages;

E. Award him an amount of money that will compensate him for the emotional harm caused by the Defendant's conduct and the conduct of its agents;

F. Award to him attorneys' fees and costs;

G. Order the Defendant to pay prejudgment interes;

H. Award him exemplary and punitive damages; and

I. Order any other relief that is consistent with justice.

## JURY DEMAND

The Plaintiff respectfully demands a trial by jury on all issues so triable.

Respectfully submitted,

The Plaintiff,
Sandy Harris, Jr.
By his Attorney,

/s/Alan Crede
Alan H. Crede, BBO No. 664451
THE LAW OFFICE OF ALAN H. CREDE, P.C.
185 Devonshire Street, Suite 302
Boston, MA  02110
(617)648-8263
alan.crede@credelaw.com

12