**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

|  |  |
|---|---|
| SANDY HARRIS, JR., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
|  | ) Civil Action No. 1:22-CV-11628-AK |
| v. | ) |
|  | ) |
| NATIONAL GRID USA SERVICE | ) |
| COMPANY, INC., | ) |
|  | ) |
| Defendant. | ) |

---

## <u>MEMORANDUM AND ORDER ON DEFENDANT NATIONAL GRID USA SERVICE COMPANY'S MOTION FOR SUMMARY JUDGMENT</u>

**ANGEL KELLEY, D.J.**

This matter is before the Court on Defendant National Grid USA Service Company, Inc.'s ("National Grid") Motion for Summary Judgment. [Dkt. 47]. On July 1, 2022, Plaintiff Sandy Harris, Jr. ("Harris") initiated this civil action against his former employer, National Grid, in state court. Harris alleges National Grid engaged in unlawful employment practices when he was terminated in August 2020. Specifically, Harris brings claims of disability discrimination (Count I), race discrimination (Count II), retaliation under Massachusetts law (Count III), retaliation in violation of the Family and Medical Leave Act ("FMLA") (Count IV), and interference with protected rights under the FMLA (Count V). [Dkt. 1-2]. On September 27, 2022, National Grid removed the case to federal court. National Grid has moved for summary judgment on all counts, arguing each of Harris' claims is legally deficient. For the following reasons, National Grid's Motion for Summary Judgment is **GRANTED**.

I.      **BACKGROUND**

The following facts are drawn from the full summary judgment record and are viewed in the light most favorable to the nonmovant, Harris, drawing all justifiable inferences in his favor but ignoring conclusory allegations, improbable inferences, or unsupported speculation.  See Quintana-Dieppa v. Dep't of Army, No. 22-1858, 2025 WL 602351, at *3 (1st Cir. Feb. 25, 2025).

A.      **Factual Background**

National Grid is an electricity and natural gas company that services more than 20 million customers throughout Massachusetts, Rhode Island, and New York.  Harris, a Black man, joined National Grid as a Change Management Analyst within its Gas Business Enablement ("GBE") program in December 2017.  The GBE program is responsible for implementing new systems of technology to replace outdated software and hardware.  As a Change Management Analyst, Harris was a subject matter expert for his workstream of the GBE program, "training others in new software systems that National Grid was adopting,"  assisting with their launch, and providing follow-up support.  [Dkt. 1-2 ¶¶ 6-11].  Harris frequently traveled for work with travel expenses paid by the company.

Initially, Harris reported to Melanie Smith, the Director of Change Management, until a reorganization in August 2019, when Jesse Harvey began sharing that role with Smith.  Harvey reported to Reihaneh Irani-Famili, National Grid's Vice President of Business Readiness for Transformation.  Harvey hired Trina Dombroski, a former National Grid employee with over 20 years' experience in various roles within National Grid, in September 2019 to be a manager within the GBE program.  In October 2019, Harris began reporting to Dombroski directly rather than to either Harvey or Smith at the director-level.

1.      **Pre-Pandemic Performance Issues**

During Harris' employment, National Grid addressed several issues with him, including the need for compliance with company policy, accurate communication regarding time off, and proper documentation of expense reimbursements.  In the first half of 2019, Harris lost two company cell phones within a few months of each other and failed to notify his manager about the second loss.  Instead, he contacted the IT department directly.  Harvey reminded Harris of the correct procedure for reporting lost phones.

Dombroski began supervising Harris in October 2019.  In November, Harris notified Dombroski that he would be on vacation from November 13 to 15 and that he planned to attend a joint session between National Grid and PricewaterhouseCoopers ("PWC") scheduled for November 18 to 19, along with Bridget McCarthy from PWC.  On the first day of the session, McCarthy contacted Dombroski to inquire about Harris' absence.  Dombroski followed up with Harris, referencing his vacation email to her and expressing confusion about his absence at the session.  Harris responded the following day, explaining that his vacation extended through November 18 and attributing the misunderstanding to an accidental omission in his email.  Following this, Dombroski met with Harris to discuss his absence and how to improve future communications about out-of-office plans.

Dombroski received automatically-generated expense reports to review and approve for her four direct reports, including Harris.  A January 2020 report indicated that 85 outstanding expense entries were tied to three individuals, with 82 of the unapproved expense reports belonging to Harris and dating back to July 2019.  Irani-Famili forwarded the report to all her direct reports, including Harvey, who sent it to Dombroski for further follow-up.  While the other two employees resolved their outstanding expenses quickly, Harris' expenses took several

months to reconcile.  Harvey consulted with Judith Dunn, the Human Resources Manager, about Harris' ongoing expense issues.  Dunn, in turn, contacted National Grid's ethics department for guidance.  The ethics department found no fraudulent entries in Harris' expenses but noted instances of poor documentation and a failure to adhere to expense policies.  Harris was ultimately required to reimburse National Grid $316.27 for unapproved expenses.  Harris admitted fault in not submitting timely receipts and acknowledged that he reviewed and accepted National Grid's expense policies when obtaining his company credit card.

On March 9, 2020, Harris met with Irani-Famili one-on-one.  During their meeting, Harris recognized the need to properly submit receipts for his expenses.  The two also talked about challenges minorities face in the workplace—Irani-Famili identifies as a person of Asian descent—and Irani-Famili encouraged Harris about his future at National Grid.  In a follow-up meeting, after observing some of his interactions with his managers, Irani-Famili addressed Harris about his behavior and urged him to consider the perception of his actions.  Harris expressed a desire for a better relationship with management to Iran-Famili.

On April 2, 2020, Dombroski delivered Harris' performance review, providing both positive feedback and areas for improvement, specifically mentioning his failure to communicate about the missed joint session with PWC.  Harris felt that his performance review included retaliatory remarks related to his expenses and he criticized Dombroski on her management style.  Dombroski informed Harvey, who in turn shared his concerns about Harris to Iran-Famili and Dunn, noting a contradiction between Harris' interactions with Dombroski and his stated intention to Irani-Famili about wanting a better relationship with management.  Dunn expressed disappointment in Harris' conduct and requested updates on his progress.

### 2.    Pandemic Performance Issues

The COVID-19 pandemic, beginning in March 2020, prompted National Grid to implement urgent measures to maintain its critical services of gas and electricity.  Some employees were able to work remotely, while others, such as those in control rooms, had to remain onsite to ensure uninterrupted operations.  National Grid routinely updated and distributed safety protocols, including personal protective equipment ("PPE") and quarantine guidelines.

Beginning July 13, 2020, Harris took a two-week vacation, returning to work on July 27. Harris spent the first week of his vacation visiting his parents in Ohio and the second week with his brother in California.  Before his vacation, Harris was involved in planning for an in-person training event in Rhode Island on July 28-29, 2020 as part of the GBE program.  The parties dispute whether there had been prior communication about Harris attending this training.  PWC's COVID protocols at the time prohibited consultants from onsite activities, requiring National Grid employees to lead the training.  A week before the training, Harvey requested that Dombroski check in with Harris for updates.  On July 22, Dombroski called Harris to discuss the training, confirming that PPE would be provided and that he needed to adhere to COVID protocols.  During this call, Harris expressed discomfort about attending and inquired about quarantine requirements, the first time he raised such concerns.  Dombroski advised him to consult with National Grid's medical department regarding quarantine.  On July 28, Dombroski forwarded the safety protocol guidance for the training to Harris.  Harris chose not to attend the Rhode Island training, citing National Grid's policy allowing employees to work in other states.[1]

---

[1] National Grid's policy stated that US-based employees were permitted to work in other states temporarily, provided the requesting employee: (1) has approval from their direct manager; (2) the ability to perform storm duty assignments as needed; and (3) has consulted with their tax advisor to understand any tax liability resulting from working in another state.

### 3.     Reasonable Accommodation Request, FMLA Request, & Termination

Dombroski forwarded this email from Harris to Irani-Famili and Dunn, noting that Harris had not requested to work outside Massachusetts before his departure.  Irani-Famili, Dunn, Harvey, and Dombroski met to discuss a response to Harris' absence from the service territory and his assigned training.  It was decided that National Grid would offer Harris the choice to return to the service territory or be deemed to have abandoned his employment, with the option of accepting nine weeks of severance if he preferred not to return.

On July 30, 2020, Dunn emailed Harris a letter stating he had violated employment terms by not returning to the service territory, informing him that failure to return would result in his job being considered abandoned.  Harris responded, stating he would return to Massachusetts immediately if his request to work out of state was denied.  He also disclosed having preexisting conditions that he believed put him "at a higher risk for COVID," though he did not further specify what those conditions were at that time and expressed that he would need "a 'reasonable accommodation' to work from home due to COVID."  [Dkt. 1-2 ¶ 46].  Dunn replied that Harris had not obtained managerial approval to work from Ohio or California, reminding him that his role required on-site services within National Grid's territory, and instructed him to return to Massachusetts immediately.  Still, Harris continued to assert that on-site work was not a requirement of his role and expressed an interest in discussing the severance details.

On July 31, 2020, Harris and Dunn discussed the severance.  In the meantime, due to Harris' ongoing absence and refusal to return to National Grid's service territory, Harvey proposed interim work for Harris on a project in upstate New York that could initially be performed remotely.  On August 4, 2020, Dunn emailed Harris the severance agreement.  In response, Harris indicated he would consult an attorney regarding the agreement and again stated

that he was hoping to take advantage of National Grid's policy allowing US-based employees to work remotely temporarily.  Dunn responded that management would not permit Harris to work remotely out of state because such a request had not been made before his departure and was denied.  Harris then inquired about a reasonable accommodation for his claimed preexisting conditions.  When Harris was hired, he completed onboarding paperwork and participated in a pre-employment medical examination.  On his self-identification form, Harris chose "*No, I Don't Have A Disability*."  Dunn notified Harris that National Grid had no record of his request for an accommodation regarding a preexisting health condition and instructed him to contact the health department for further assistance.

On the morning of August 6, 2020, Harris applied for leave under the FMLA to care for his mother, indicating he sought leave until November 2020.  Of note, during his deposition, Harris testified that he sought FMLA for himself because of smoking symptoms, but also stated he never formally applied for it.[2]  [Dkt. 55-1 at 28-31].  On the afternoon of August 6, 2020, Harris emailed Dunn, informing her he contacted National Grid's health department about his accommodation request and inquired about his entitlement to paid sick leave under FMLA or the Families First Coronavirus Response Act ("FFCRA").  He did not disclose that he had already submitted an FMLA application to take care of his mother.  Dunn reiterated that National Grid had no record of any preexisting conditions and inquired if Harris had reviewed the severance agreement.  On August 7, 2020, Dunn emailed Dombroski and Harvey to ask if Harris had mentioned being sick or taking sick time; both confirmed that Harris had not reported any sickness and that he was performing remote work.  Dunn emailed Harris information about

---

[2] To be clear, contemporaneous business records from National Grid's third-party benefits administrator, Sedgwick Claims Management ("Sedgwick"), show that Harris applied for leave until November 2020 under the FMLA on August 6, 2020 to care for his mother.  Although Harris never formally applied seeking FMLA leave *for himself*, he did to care for his mother and ultimately withdrew that application.

National Grid's sick leave and FMLA policies, stating that any requests would be reviewed by National Grid's medical department. On August 7, 2020, a representative from Sedgwick called Harris. Contemporaneous call notes demonstrate that Harris wished to cancel his claim and did not want to use FMLA at that time. On August 10, 2020, Dunn provided an update to Harvey and Irani-Famili, stating she had not received a response about the severance offer and that Harris had indicated medical issues requiring accommodations. Harvey confirmed that Harris attended a work call on the previous Friday and was working. On the same day, Dombroski received a leave status report from Sedgwick indicating that Harris' case was closed and canceled at the employee's request. Dunn forwarded the leave status report to Harvey and Theresa Overdyk, Manager of National Grid's Health and Wellbeing Department, and Overdyk confirmed Harris' FMLA request had been withdrawn.

Dunn followed up on the severance offer in an email to Harris on August 11, 2020. Approximately 30 minutes after Dunn's email, Harris contacted Sarah Lavalle, a National Grid Nurse, referencing a letter from his physician and requesting a call. Harris subsequently informed Dunn that he had emailed Lavalle and was awaiting her response. On the afternoon of August 11, 2020, around 4:00 PM, Lavalle had a phone conversation with Harris, during which he expressed discomfort about returning to the office for training, disclosed a severe throat and lung condition, admitted to being a smoker, and mentioned a past car accident. Harris stated that his doctor had advised remote work accommodations and planned to contact his doctor to obtain the necessary documentation. Shortly after the call, a physician faxed a note stating:

> To Whom It May Concern: It is my medical opinion that Sandy Harris would benefit from an accommodation to work remotely during the COVID pandemic. If you have questions or concerns, please don't hesitate to call.

This note is the sole medical documentation Harris provided in justification of his request for a reasonable accommodation.

After receiving the faxed doctor's note, Lavalle shared it with Overdyk. The next morning, on August 12, 2020, Overdyk informed Dunn that the medical documentation was insufficient and instructed Lavalle to communicate that to Harris. That same day, Overdyk drafted a letter outlining National Grid's reasonable accommodation process and asked Lavalle to send it to Harris. Lavalle emailed the letter to Harris, inviting him to contact her with any questions. The letter requested that Harris provide adequate medical documentation by the close of business on August 18, 2020. Harris acknowledged receiving the August 12 letter and understanding that the medical documentation was insufficient. After receiving the letter from Lavalle, Harris did not reach out to Dunn again.

The following week, Dunn inquired with Overdyk and Lavalle if Harris had provided any additional information. Both confirmed that Harris had not submitted any further information. Dunn learned from Overdyk that Lavalle had attempted to reach Harris again, but it was reported that Harris hung up on Lavalle. That evening, Dunn informed Irani-Famili and other National Grid leaders that she had not received further information from Harris and would be sending a termination notice the next morning. On the morning of August 19, 2020, Dunn again verified that Lavalle had not received any new information from Harris and then sent Harris an email and letter terminating his at-will employment.

### B.    Procedural History

On February 18, 2021, Harris filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). Following this, he requested leave to file this lawsuit, and the MCAD issued a Dismissal and Notification of Rights letter, fulfilling all conditions precedent to this action. In July 2022, Harris filed suit in Massachusetts Superior Court and on September 27, 2022, National Grid removed the lawsuit to federal court based on

diversity jurisdiction.  On August 5, 2024, National Grid filed a summary judgment motion that is the subject of this Order.

## II.    LEGAL STANDARD

Summary judgment is meant to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Burt v. Bd. of Trustees of Univ. of R.I., 84 F.4th 42, 59 (1st Cir. 2023).  Summary judgment is granted when the moving party demonstrates that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute involves evidence that, when viewed in the light most favorable to the nonmovant, allows a rational factfinder to resolve the issue in favor of either, and material facts are those that could impact the outcome of the case under applicable law.  Gattineri v. Wynn MA, LLC, 63 F.4th 71, 84-85 (1st Cir. 2023).  The opposing party bears the burden of producing specific facts to counter the motion for summary judgment and cannot rely on conclusory allegations or speculation.  Theidon v. Harvard Univ., 948 F.3d 477, 494 (1st Cir. 2020).  Even though the nonmovant for summary judgment is entitled to all reasonable inferences from the record, there are limits; for instance, the court will not draw "unreasonable inferences" or "credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." Alston v. Int'l Ass'n of Firefighters, Loc. 950, 998 F.3d 11, 24 (1st Cir. 2021) (quoting Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007)).  This remains true in discrimination and retaliation cases where motive is at issue; a nonmovant cannot rely "merely upon conclusory allegations, improbable inferences, and unsupported speculation."  River Farm Realty Tr. v. Farm Fam. Cas. Ins. Co., 943 F.3d 27, 41 (1st Cir. 2019) (quoting Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855-56 (1st Cir. 2008)).

## III.    DISCUSSION

This Court will first address Harris' state law discrimination and retaliation claims, which are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, which applies when a plaintiff lacks direct evidence of discrimination.  411 U.S. 792 (1973).  At the first stage, the plaintiff must establish a prima facie case of discrimination or retaliation.  Id. at  802.  Then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action.  Id.  At the final stage, the burden shifts back to the employee to demonstrate that the employer's explanation was a pretext for discrimination.  Id. at  804.  Pretext may be established in various ways, including highlighting "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation.  Miceli v. JetBlue Airways Corp., 914 F.3d 73, 82 (1st Cir. 2019) (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)).  Throughout this process, the ultimate burden of persuasion remains with the plaintiff.  See Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015).  This Court will address each claim in turn.

### A.    Disability Discrimination

The *McDonnell Douglas* burden-shifting framework applies to disability discrimination claims under Chapter 151B.  See Brader v. Biogen Inc., 983 F.3d 39, 54-55 (1st Cir. 2020).  In Massachusetts, it is unlawful for an employer to dismiss, or refuse to hire, rehire, or advance in employment, or otherwise discriminate against any qualified individual claiming to have a disability, if that individual can perform the essential functions of the position with reasonable accommodations.  Mass. Gen. Laws ch. 151B, § 4(16).  An employer may only avoid this obligation by demonstrating that the required accommodation would impose an undue hardship on the employer's business.  Id.  National Grid seeks summary judgment on Harris' disability

discrimination claim, asserting that he has not established the required elements: (1) he is disabled under the law; (2) he is a qualified individual capable of performing essential job functions with or without accommodations; and (3) discharged in whole or in part due to his disability.  See Sarkisian v. Austin Preparatory Sch., 85 F.4th 670, 675 (1st Cir. 2023).  Harris responds by arguing that his respiratory issues and heightened risk factors, such as asthma and high blood pressure, are recognized disabilities, his role did not necessitate in-person attendance, and he could perform his duties with reasonable accommodations.  National Grid counters that Harris previously certified he had no disabilities, maintains it engaged appropriately in the interactive process for accommodations, and challenges  Harris' assertions regarding the essential functions of his job, emphasizing that in-person attendance for training is crucial. Additionally, National Grid points out that Harris rescinded his request for unpaid FMLA leave, which undermines his accommodation claims.

For an employee's actions to qualify as a request for accommodation, it is necessary to clearly communicate to the employer that the employee is entitled to and in need of such accommodation.  Miceli, 914 F.3d at 82.  The request must clearly articulate the need for accommodation and connect the employee's disability to the requested action.  Id. at 83 (citing Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012)).  Requests that lack specificity or clarity do not meet the threshold for actionable accommodation requests.  Miceli, 914 F.3d at 83.  Id.  If the requested accommodation is inappropriate or unsuitable, the employer is still required to make a reasonable effort to determine the appropriate accommodation through a flexible, interactive process involving both parties.  Miceli, 914 F.3d at 82.  Chapter 151B does not, however, impose an obligation on employers to unilaterally modify their policies in the absence of a specific, requested accommodation from the employee.  Id.

When an employer claims that standard policies support an adverse employment action against an individual with a disability, that individual may illustrate pretext by demonstrating that the policies were not applied uniformly.  See id. at 84.  This can be accomplished by showing a departure from clearly defined policies or inconsistent application of those policies to similarly situated employees.  Id.  A uniform application of a facially neutral policy can serve as a legitimate, non-discriminatory reason for termination, even when the employee has a disability. Id. at 82 (citing Leary v. Dalton, 58 F.3d 748, 754 (1st Cir. 1995)).  The employee must provide evidence that the employer applied the relevant policies disparately.  See Ing v. Tufts Univ., No. CV 21-10032-RGS, 2022 WL 7683485, at *5 (D. Mass. Oct. 13, 2022), aff'd, 81 F.4th 77 (1st Cir. 2023).  But, if the employee has not engaged in procedures available through the employer to address or dispute the issues leading to the adverse action, this inaction can undermine their claim.  See Miceli, 914 F.3d at 84 (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) (holding that in discrimination case, courts may not "sit as super personnel departments" to assess the merits or rationality of employers' nondiscriminatory business decisions)).  Finally, an employer is not obligated to give an employee their preferred accommodation.  Oquendo v. Costco Wholesale Corp., 857 F. App'x 9, 11-12 (1st Cir. 2021) (citing Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986); Feliciano v. Rhode Island, 160 F.3d 780, 787 (1st Cir. 1998)).

Here, Harris stumbles at the starting gate.  He contends that respiratory issues and health conditions exacerbated by COVID-19 qualify as disabilities but, at the time of his hiring, he certified that he had no disabilities or breathing-related symptoms.  [Dkt. 61 ¶ 4].  This certification undermines his current claim of disability.  Nonetheless, the Court assumes without deciding that Harris' claimed preexisting conditions, coupled with COVID-19, makes him a disabled person under 151B.  Next, Harris must demonstrate that he is a "qualified handicapped

person," capable of performing the essential functions of his job with or without reasonable accommodations.

National Grid asserts that travel and on-site work are essential functions of his role. [Dkt. 61 at 54-53]. While Harris claims that other Change Management Analysts work remotely and his job description does not specifically mandate in-person attendance, essential functions are determined not merely by job descriptions but through an analysis of the actual duties performed and the employer's operational needs. The law acknowledges that essential functions may encompass requirements not explicitly stated in the job description. Oquendo, 857 F. App'x at 12 n.3 ("An employer's official job description is relevant—but not dispositive—in determining what the essential functions of a position are."). In this context, this Court agrees with National Grid that Harris' contradictory statements and attempts to minimize his role do not alter the reality of his responsibilities. His actual duties included on-site training—an aspect he acknowledged—and he has not provided sufficient evidence to indicate he could perform these essential functions effectively without in-person involvement. The threshold for showing that one can perform essential job functions with or without accommodations is a rigorous one, requiring more than anecdotal evidence; rather, it necessitates a clear demonstration of capability despite the claimed disability. See, e.g., Sarkisian, 85 F.4th 670 (affirming summary judgment on a teacher's action against the school because regular, in-person attendance was an essential function of her role and there was no facially reasonable accommodation the school could propose); Richardson v. Friendly Ice Cream Corp., 594 F.3d 69 (1st Cir. 2010) (granting summary judgment on a restaurant employee's claims who was afflicted with a shoulder injury and not capable, with or without reasonable accommodation, of performing essential functions like manual tasks); Phelps v. Optima Health, Inc., 251 F.3d 21 (1st Cir. 2001) (affirming

summary judgment and finding a hospital was not required to exempt a nurse with a back disability from performing essential functions, nor reallocate her essential functions to other employees). While Harris' suggestions for accommodation reflect an effort to be flexible, they do not adequately address the necessity of fulfilling fundamental job duties. Requests for unpaid leave or the delegation of his essential responsibilities to colleagues fail to qualify as reasonable accommodations since they would fundamentally undermine his role and potentially impose undue hardship on National Grid. Courts recognize that reasonable accommodations must facilitate an employee's ability to perform their job, rather than alleviate the employee from those responsibilities altogether. See Mulloy v. Acushnet Co., 460 F.3d 141, 148 (1st Cir. 2006).

Regarding the final element of Harris' claim, he must prove that National Grid discriminated against him based on his claimed disability. However, he has not substantively established that his alleged disability was a motivating factor in any adverse employment action taken against him. National Grid engaged in the interactive process and made a good faith effort to evaluate his needs—including his temporary reassignment to the upstate NY project that had not yet entered a phase requiring an in-person presence. Employees are required to engage in this interactive process, too, in good faith to develop reasonable accommodations. Caruso v. Delta Air Lines, Inc., 113 F.4th 56, 77 (1st Cir. 2024). If the employee does not cooperate in the interactive process in good faith, the employer cannot be held liable for a failure to provide reasonable accommodations. Id. (citing Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008)). Harris' failure to submit sufficient medical documentation concerning his claimed disability and to cooperate in the interactive process hinders his ability to substantiate his requests for accommodations.

Examining whether National Grid's actions constituted a failure to accommodate, the Court notes that a reasonable accommodation must not impose undue hardship on the employer. See Mass. Gen. Laws Ch. 151B, § 4(16).  National Grid has outlined how adjustments to the role and responsibilities might detrimentally impact business operations, especially given the size of the organization and the nature of the work involved, as well as Harris' expertise in his workstream.  Courts typically defer to employers' assessments of undue hardship as they possess a deeper understanding of their operational dynamics.  Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 88 (1st Cir. 2012).  Ultimately, Harris has not demonstrated any discriminatory animus motivating any actions taken by National Grid, nor has he established a nexus between his asserted disability and the termination he faced.  Given these facts, including the lack of corroborative evidence relating to his disability, National Grid's documented efforts to engage with him, and the absence of any discriminatory intent or actions, summary judgment is **GRANTED** in favor of National Grid on Harris' disability discrimination claim.

## B.     Race Discrimination

In Massachusetts, race discrimination claims are evaluated through the *McDonnell Douglas* burden-shifting framework.  See Stratton v. Bentley Univ., 113 F.4th 25, 38 (1st Cir. 2024).  Harris alleges race discrimination under Chapter 151B, claiming that National Grid acted with "evil motive or reckless indifference" toward his rights.  National Grid seeks summary judgment, asserting this claim lacks substantial evidence, particularly in identifying any adverse actions related to his race.  While Harris claims he was singled out for time-off requests and issues related to expense handling, National Grid argues that these examples reflect his failure to comply with company policies rather than racial discrimination.  Harris contends that is pretext,

as his status as one of the few Black employees and a conversation with Irani-Famili about workplace challenges for minorities instead implies discriminatory intent.

In this instance, assuming without deciding that Harris has made a prima facie race discrimination claim, National Grid satisfied the second step of the *McDonnell Douglas* burden-shifting framework by providing legitimate nondiscriminatory justification for Harris' termination, while Harris fails to present circumstantial evidence demonstrating a clear nexus between his termination and racial discrimination. The references he provides do not establish such a connection. For instance, regarding his November 2019 time-off request, Harris was not disciplined for missing a scheduled joint session; rather, he received constructive feedback to prevent future misunderstandings. He provides no factual support to show he was treated differently than similarly situated employees. Harris also alleges he faced greater scrutiny than his colleagues regarding expenses; however, on a four-member team, he was solely responsible for 82 out of 85 outstanding expense reports. The evidence indicates that his colleagues with similar expense issues were subject to the same company policies, regardless of race, and successfully resolved their few outstanding expenses. Additionally, Harris admitted to mismanaging his expenses, which were resolved after he repaid funds for undocumented claims. Separately, Harris references a conversation with Irani-Famili about workplace challenges faced by minorities but fails to connect this conversation to any specific grievances at National Grid.[3] Such isolated instances do not constitute evidence of discriminatory intent—particularly when the comment conveys solidarity rather than animus. Lastly, his requirement to return to the service territory following his July 2020 vacation aligns with his job responsibilities. The evidence presented indicates that Harris' termination was based on legitimate business reasons

---

[3] Harris additionally alleges, and National Grid disputes, that Irani-Famili pointed to the skin on the back of her hand at some point during the conversation and remarked, "I know it's hard sometimes because of this."

rather than racial animus.  Since Harris has not rebutted National Grid's legitimate, nondiscriminatory basis for his termination with evidence of pretext or discriminatory motive, summary judgment is **GRANTED** in favor of National Grid on his race discrimination claim.

### C.    State Law Retaliation

Harris next alleges that National Grid terminated his employment as retaliation for his request for accommodation.  Harris' retaliation claim, like his discrimination claims, is analyzed under the *McDonnell Douglas* burden-shifting framework.  See Ing v. Tufts Univ., No. CV 21-10032-RGS, 2022 WL 7683485, at *5–6 (D. Mass. Oct. 13, 2022), aff'd, 81 F.4th 77 (1st Cir. 2023).  Harris contends that he can pursue a retaliation claim regardless of whether he is disabled or entitled to accommodations, provided his requests were made in good faith.  He argues that the timing of his accommodation request and termination—approximately three weeks apart—supports an inference of causation.  To bolster his claim, Harris presents circumstantial evidence, including a statement from Dunn asserting that his termination stemmed solely from his failure to return to the service area.  Additionally, after Harris' termination, Dunn instructed others to compile information on his expenses and cell phone usage, implying those were only post-hac justifications for his dismissal.  Harris argues that these facts suffice to show his request for reasonable accommodation was a motivating factor in his termination.

A retaliation claim cannot rely solely on evidence that the protected activity was one factor among many in the employer's decision.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 359-60 (2013) (distinguishing between the "motivating-factor" and "but-for" causation standards).  In other words, the plaintiff must demonstrate that the employer would not have taken the adverse action but for the desire to retaliate.  Id. at 352.  This standard prevents poorly performing employees from circumventing termination solely due to their engagement in

protected conduct.  Stratton, 113 F.4th at 44 (citing Nassar, 570 U.S. at 358).  An inference of causation may arise if an adverse action occurs against a satisfactorily performing employee immediately after the employer becomes aware of the protected activity.  Mole v. Univ. of Massachusetts, 442 Mass. 582, 592 (2004).  However, if problems with an employee predate the employer's knowledge of their protected activity, it is impermissible to infer that subsequent adverse actions are motivated by retaliation.  Id. at 594.  For example, in Pearson v. Mass. Bay Transp. Auth., the First Circuit held that a plaintiff alleging retaliation under Chapter 151B did not demonstrate a sufficient causal connection since their supervisors had recommended termination before the protected activity occurred.  723 F.3d 36, 42 (1st Cir. 2013).  Even if the final decision to terminate the plaintiff happened after the protected activity, the plaintiff needed to demonstrate that the outcome would have changed had the employer not known of the protected activity.  See id.  Similarly, in Miceli, the court affirmed summary judgment in favor of the employer because the appellant was under suspension and review for termination when she filed her MCAD complaint.  914 F.3d at 85.

The present case closely follows *Pearson*.  Harris claims he was terminated solely due to his accommodation request.  While Harris' termination is undoubtedly an adverse employment action, his retaliation claim falls short because he cannot demonstrate a causal connection between his request for a reasonable accommodation and his termination.  Harris' conflicts with his managers seemingly began when he bypassed them to report a second lost phone to IT directly within months of losing his first phone, which surprised Harvey and resulted in a reminder to adhere to company protocols.  Shortly thereafter, Dombroski, who was newly managing Harris, was taken aback to learn from a PWC employee that Harris had not shown up for a scheduled event.  Then, as his managers endeavored to assist him in resolving outstanding

expense reports, Harris persistently questioned why he was being scrutinized regarding expenses on the company credit card.  In light of his numerous unapproved expenses and behavioral issues, National Grid's ethics department was consulted for guidance and conducted a separate review of his expense entries.  Although Harris' conduct prior to the pandemic reportedly played no role in National Grid's decision to terminate him, that his conduct was perceived as potentially unethical months before any claims of protected activity is significant.

Harris' argument relies solely on the temporal proximity of his request for reasonable accommodation and his termination; however, this reliance is misplaced.  Mere temporal proximity does not suffice to raise an inference of retaliation when the employer articulates a non-retaliatory basis for its actions.  See Hodgens, 144 F.3d 151.  National Grid informed Harris it would consider him to have abandoned his job if he did not return to the service area prior to his reasonable accommodation inquiry or request for leave under the FMLA.  The absence of storm duties at that time and the temporary arrangement for remote work do not negate National Grid's policy requirements affecting Harris' employment status.  Despite the warning and his awareness of the potential job abandonment, Harris did not return to the service area.  Moreover, weeks after Dunn instructed him to engage with National Grid's medical department to establish a record of his disability and accommodation needs, Harris did not complete the process.  Given the legitimate explanations presented for his dismissal, the temporal connection becomes nothing more than speculative.  The record lacks evidence suggesting that National Grid's decision was influenced by Harris' accommodation request; the justifications provided align with company policy and operational requirements.  This Court refrains from inferring a causal connection in this case, particularly when negative performance evaluations predate his protected activity.  Under these circumstances, Harris fails to meet the legal standards outlined in Chapter 151B.

Therefore, National Grid's motion for summary judgment regarding the retaliation claim is
**GRANTED**.

### D.    Family and Medical Leave Act

The FMLA aims to support employees in balancing their work and family lives.  See 29
C.F.R. § 825.101; 29 U.S.C. § 2601(b)(1)-(2).  FMLA allows an "eligible employee" to take
reasonable leave, up to a maximum of twelve weeks within a twelve-month period, for personal
medical reasons or to care for a family member with a serious medical condition.  29 U.S.C. §
2612.  Its provisions are divided into those that establish substantive rights and those that protect
the exercise of these rights.  See Hodgens, 144 F.3d at 159.  It is crucial to distinguish
interference claims from retaliation claims under the FMLA, as interference involves the denial
of substantive rights, while retaliation centers on an employer's response to an employee's
exercise of those rights.  Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 722 (1st
Cir. 2014).  In his Complaint, Harris alleges that National Grid both interfered with and retaliated
against him by terminating him.  [Dkt. 1-2 at 10-11].  This Court will address each claim in turn.

### 1.    Retaliation in Violation of the FMLA

To establish a claim of retaliation under the FMLA, the plaintiff must demonstrate: (1) he
engaged in a protected activity by requesting FMLA leave; (2) he experienced an adverse
employment action; and (3) a causal link exists between his leave request and the employer's
adverse action.  Thompson v. Gold Medal Bakery, Inc., 989 F.3d 135, 144 (1st Cir. 2021).  The
plaintiff must show that the employer "terminated him not because of any inappropriate behavior
on his part, but in retaliation for his [request for] protected medical leave."  Colburn v. Parker
Hannifin/Nichols Portland Div., 429 F.3d 325, 335 (1st Cir. 2005).  This necessitates
demonstrating a causal connection between the termination and the employer's retaliatory intent.

To facilitate this, the First Circuit employs the *McDonnell Douglas* burden-shifting framework, even in the absence of direct evidence of retaliation.  Id.  Under this framework, first, a plaintiff must present sufficient evidence to establish a prima facie case of retaliation; subsequently, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the termination.  If the employer does so, the presumption of discrimination is overcome, and the plaintiff retains the ultimate burden of proving that the employer's reason was a pretext for retaliation related to the protected FMLA leave.  Hodgens, 144 F.3d at 160-161.

Harris struggles to establish the final element of his retaliation claim.  While the first two elements—protected activity and adverse employment action—can be considered satisfied, the critical question remains whether National Grid terminated Harris due to his withdrawn request for FMLA leave.  Harris attempts to link the timing of his FMLA leave request to his termination, arguing that the temporal proximity between his request on August 6 and his termination fewer than two weeks later is sufficient to demonstrate causation.  [Dkt. 56 at 18]. The Court finds this argument unpersuasive.  Temporal proximity alone cannot establish causation if, as the circumstances indicate, "it is almost certain that the decision to fire" him "was already in the works and had nothing to do with" his leave request.  Germanowski v. S. Constr. Group, LLC, 854 F.3d 70, 74-75 (1st Cir. 2017).   Moreover, even in viewing the evidence favorably to Harris, it is implausible that Dunn and Irani-Famili would terminate him due to an FMLA claim that had yet to be filed.  Harris must demonstrate that those responsible for his termination were aware of his protected activity, as National Grid cannot be motivated to retaliate against an action of which it was unaware.  See Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 70 (1st Cir. 2015) (citing Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013)).  Harris' FMLA retaliation claim also ignores that he was warned of job

abandonment before he inquired and applied for FMLA leave.  In conclusion, without sufficient

evidence to substantiate a causal link between his withdrawn FMLA leave request and the

adverse employment action taken against him, Harris' claim for FMLA retaliation does not hold.

Thus, National Grid is entitled to summary judgment regarding this claim as well.

## 2.    Interference with Protected Rights Under the FMLA

Under the FMLA, an employer is prohibited from impeding an employee's ability to take

leave to which they are entitled.  To prevail on an FMLA interference claim, a plaintiff must

establish five elements: (1) he is an eligible employee under the FMLA; (2) the defendant is an

employer as defined by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he

provided the defendant with notice of his intention to take leave; and, (5) he was denied benefits

to which he was entitled under the FMLA.  Boadi v. Ctr. for Hum. Dev., Inc., 239 F. Supp. 3d

333, 343-44 (D. Mass. 2017).  Specifically, FMLA interference claims focus on whether an

employer has provided its employee the entitlements outlined in the FMLA or, in some cases,

whether the employer discouraged the employee from exercising their FMLA rights.  Stratton,

113 F.4th at 46.  "If dismissal would have occurred regardless of employee's request for FMLA

leave, an employee may be dismissed even if dismissal prevents her exercise of her right to an

FMLA leave."  Boadi, 239 F. Supp. 3d at 344.

In the present case, the undisputed facts reveal that National Grid fulfilled its obligations

under the FMLA.  Harris acknowledges that he was never denied the FMLA leave he submitted

to care for his mother—he withdrew that request before any management became aware of it.[4]

---

[4] Harris claims there is a genuine dispute of material fact regarding whether he ever withdrew his FMLA claim; however, this Court finds that the dispute is neither genuine nor material.  Hearsay is inadmissible unless it fits within a recognized exception. See Fed. R. Evid. 802; Bradley v. Sugarbaker, 891 F.3d 29, 34 (1st Cir. 2018).  To qualify under Fed. R. Evid. 803(6), a record must be "kept in the course of a regularly conducted activity of a business" and "making the record was a regular practice of that activity."  Fed. R. Evid. 803(6)(B); 803(6)(C). Sedgwick's contemporaneous call notes, as a record that was standard practice to keep and compile in its ordinary course of business, falls into this exception and this Court accepts the record for its facial truth.

While Harris argues that National Grid's "continual monitoring of [his] FMLA application" leading up to his termination suggests the company timed his dismissal to prevent him from completing his application, this assertion lacks substantive support.  [Dkt. 56 at 18-19].  Additionally, Harris references two Department of Labor regulations related to the FMLA as evidence of National Grid's alleged interference.  First, he cites to 29 C.F.R. § 825.305(b), which requires employees to provide any requested medical certification for FMLA leave within 15 calendar days of their employer's request.  Second, he mentions § 825.305(d), which mandates employers to inform employees about the consequences of failing to provide adequate certification.  Harris' claim fails to demonstrate that National Grid discouraged him from taking FMLA leave.  In fact, Dunn provided Harris with guidance and encouraged him to engage with National Grid's medical team, which followed up with him regarding the submission of the required documentation.  Therefore, even when considering the facts in the light most favorable to Harris, the evidence does not substantiate a claim of unlawful interference under the FMLA and National Grid is entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment  [Dkt. 47] is **GRANTED**.

**SO ORDERED.**

Dated: March 26, 2025                                     /s/ Angel Kelley
                                                          Hon. Angel Kelley
                                                          United States District Judge